The next case today is Construction Industry and Laborers Joint Pension Trust v. Carbonite, Inc. at all. Appeal number 20-2110. Attorney Love, please introduce yourself for the record and proceed with your argument. May it please the court, Andrew Love for appellants. I would like to reserve three minutes for rebuttal, if I may. Yes, you may. Thank you. This is an appeal from the dismissal of a securities fraud complaint alleging that Carbonite and two senior executives misled investors about its new data backup product, VMI, which they claimed was a super strong product that made the company extremely competitive in the virtual data backup market. At the time these statements were made, VMI did not work and had never worked as intended. The district court dismissed the complaint for failing to allege a strong difference of scienter. But what makes this court, this case different from other securities cases that have been brought before this court is that the competing non-culpable inference proffered by defendants is actually culpable and essentially concedes defendants' recklessness. The district court accepted as the more plausible competing inference that defendants genuinely believed that VMI would eventually be fixed. But as described, most notably by the Seventh Circuit Intellabs, defendants' concealment of bad news in the hope it would be overtaken by good news is reckless. Even if defendants thought the situation would right itself. Defendants themselves stated what a really important product VMI was for Carbonite. In an argument below they acknowledged that quote consistent with allegations in the complaint, Carbonite was working quote feverishly to fix VMI's problems before withdrawing it from the market only nine months after its launch. And that's at the transcripts is at the appendix J1325. And so while defendants contended feverish efforts to fix VMI shows that they sincerely hoped VMI would eventually work, that supports the answer because it confirms both the importance of VMI to the company and defendants' awareness of VMI's problems. And so their statements were highly reckless because they knew or it was so obvious that they must have known that their statements risk misleading investors by giving positive statements without any hint that there were any problems with the product. And as this court stated in Ariad, 842 at third at 750. This is a quote, while management may have held out hope of achieving this result, in that case it was FDA approval. The expression of that hope without disclosure of recent troubling developments created an impermissible risk of misleading investors. Mr. Love, I understand the argument that's being made with respect to the statements concerning the product as misrepresentations. I'm not quite sure I understood. Do you have a separate claim regarding the later on earning forecasts as to whether those are actionable as statements? The argument for those is, number one, defendants did have actual knowledge of these problems with VMI, which was part of the guidance when they made these statements. And number two, there was not any meaningful cautionary statement that the risk warnings were very generic. It was just, you know, new technology may incur, may have some defects. It's the same sort of warning they gave year after year without any change. And then on the first point, as far as the earnings forecast, their defense that they were hoping it would get fixed might actually work on the earnings forecast in a way that it wouldn't work on the statements, wouldn't it? Because they're forecasts of the future as opposed to a representation of the present as the product statements were. But certainly the arguments are much stronger with regard to those initial statements about the product. No question about that. What difference does it make? Tell me what practical difference it makes to the case as to whether you have a claim based on the statements regarding the product alone or have a claim based on both. Is it the same class period or you've got two subclasses or what? I think it's the same class period since the initial strong statements about the product precede the guidance. So it would encompass the same class period, even if the guidance, your honors find the guidance questions are not actionable. Although I do believe that even though they were more, I mean, they say they're hopeful. There's nothing in the record that says they're hopeful. That's just sort of their argument. And when they gave the revenue guidance, there was no hint that there were any problems. And as we alleged, they were aware that they had actual knowledge that VME didn't work. It was a data backup product that didn't back up data. I forget whether with respect to that latter set of statements, the district court ruled on SIENTA alone or also that it wasn't misleading, just SIENTA? Just SIENTA. And for purposes of this appeal, is any argument being made to us that those statements were not misleading or is the argument just SIENTA? Your honors can decide this case on any issue. Appellees certainly make the arguments that they were not misleading. Not misleading. Yes. And the argument that they are misleading from your perspective depends on the extent to which it's not plausible that they could have thought that they had no basis for thinking that they, that the product could succeed. Is that the idea? That would be the idea if they were considered opinions, but in terms of whether or not they were misleading, the argument is pretty straightforward. It's, they said this was a strong product. No, no, no, no. The earnings forecast statements. Are those the same ones? I'm sorry, I lost your question. So we're talking just about the guidance, the guidance questions. I don't think, I think the argument is forward. You said there's two statements that are forward looking statements. Right. Those are the projections. Those are the revenue projections. Revenue projections. What is your argument about why those are misleading? Because the guidance that was given that included VME's sales was misleading because the guidance ended up being reduced given that VME did not actually work. In other words, you're saying that even though the revenue forecast is a prediction, that it's not a reasonable, plausible prediction given the defendant's knowledge that it wasn't the question of whether they would get it working, but that it didn't work and never had. Exactly. Given their actual knowledge that it didn't work and their lack of any meaningful cautionary warnings that those statements are actionable as well. Five minutes remaining, five minutes. Again, I would argue that the earlier statements are by far the strongest ones because they clearly talk about how VME was a strong product that made the company extremely competitive. And it was a product that had serious problems. It never backed up data that it was supposed to back up and was launched anyway. And the defendant gave these statements without any hint that there were any problems until they ultimately withdrew the product nine months later. If there are no further questions, I'll reserve the rest of my time for rebuttal if I may. Thank you. At this time, Mr. Love, you should please mute your audio and video. And Attorney Nanda, if you could please unmute your audio and video and introduce yourself on the record to begin. Good morning. My name is Alicia Nanda and I represent Carbonite, Mr. Ali, and Mr. Folger. May it please the court. Plaintiff states time and time again in its papers that Carbonite's then CEO and CFO must have known that VME didn't work, that it's inconceivable that they didn't know, indisputable, undeniable. But these kinds of adjectives do not take the place of well-pled particularized facts that show that Mr. Ali and Mr. Folger did not believe the statements that they made about VME at its launch. Even plaintiff concedes on appeal in its reply brief at 10 that the complaint lacks direct facts alleging when Mr. Ali or Mr. Folger became aware that VME was dysfunctional. And even more fundamentally, the complaint doesn't even explain with any precision what was wrong with VME and when. But the complaint does allege counsel, doesn't it? The DME never worked ever. So, yes, Your Honor. Yes, it does allege that. And the statements, I'm not talking now about the revenue forecast, which to me, at least, is a different issue. I'm talking about the initial statements, so-called launch statements. Those statements were made as statements of present fact. They were made in the present tense, were they not? This is a super strong product, which makes us strongly competitive or whatever the exact word was. Yes, Your Honor. Mr. Folger's statement- Okay, and it's clear from the record that that statement was untrue because at that time, since the product never worked, it could not have been a super strong product in the present tense. And it did not. It may have had the potential for making the company more competitive, but it certainly in its then condition couldn't have made the company more competitive. So, is it much of a stretch to say that the CEO and CFO must have known that, particularly when they're out making statements? Yes, absolutely. We're not talking about a lamp or some sort of simple product that switches on and off and one can see right away it works or it doesn't work. This is a software product that's quite complex, that's built to run on various clients' systems that vary client to client. They're backing up virtual environments that vary client to client. It's not the case that the product didn't work. It did back up client files. The only thing the complaint says, and it only says it in one paragraph, is that it didn't back up client's files the way it was supposed to. That's a pretty long throw from super strong product. Well, Mr. Folger did state soon after the launch period that he believed the product was a super strong product. There are no allegations pled in this complaint to suggest that the CFO of the company did not believe that on November 15th. Let me ask you about that. The question is, is there a strong inference that they knew? Strong inferences that they knew were recklessly disregarded. We've said before what a strong inference was. It doesn't have to be an overwhelming interest. It has to be at least as good as the contrary interest. We've also shown that if something is important to the company, that in and of itself starts to raise an inference that the senior management knew about it, if it's really important. We have the CFO deciding and the CEO both affirmatively bringing up this product and talking to investors, touting the product, and then saying it is a really important product for the company. You want us to infer that they did all of that without checking to see if the product worked. That seems to be quite a stretch. Well, let me say this, and I'll go right to it. Mr. Folger did refer to this product as really important, which in and of itself is not very informative. Companies don't release unimportant products. VMA was one of dozens of products and services that Carbonite offered at this time. But the allegations and complaints show that no investor actually asked about VMA at any point in time between the initial launch period and the time that the product was pulled. When the product was pulled, they only moved their revenue guidance down very modestly. It was 3% at the low end, 5% at the high end, and the company only attributed one third of that downward adjustment to the discontinuation of the VMA. Just so I get it, if the complaint had an allegation of direct evidence that the CEO knew it didn't work when he made the statement, you agree that would be a strong evidence of scientific, correct? I think I would agree if it didn't back up according to a standard that's accepted in the industry. I mean, I wouldn't agree if it were... I just want to make sure I understand that. That if is meant to say that there would have to be more in the complaint about how it didn't work than there is or not? Absolutely, because one could say... Let me just take it in step. Given what the complaint says about why it didn't work, if there were an allegation in the complaint that somebody heard him say, I know that much about the product, you would say even then there was not a basis for finding Scienter if he made the statements in question? Well, I think everything's about context. If someone said, this is only backing up 95% of files... I just want to stick with what I'm saying. The complaint says what it says about the ways in which the product did not work. If the complaint contained an allegation that the CEO said, I know that, and he made the statements that were made, would you agree then the complaint would suffice to show a strong inference of sound? That would certainly be a harder case, although I'd say that the allegations regarding the bug fixes and the engineering teams would suggest a contrary inference that people at the company believe that with enough work, this product could be accepted in the marketplace and successful. Let me ask you... I agree it's a harder case. It would be a harder case. The hope that it would be fixed, I see how that helps you on the earnings projections, but doesn't it cut against you by making it more plausible that they would lie regarding the current condition of the product if they thought that it could be fixed, because then no one would ever find out that they lied? If they knew it was dead, it was never going to be fixed, then they're going to be very hesitant to lie because they know they're going to be caught eventually. I don't think they have any motivation as set forth in this complaint to put out a product that they knew was going to be a complete dud, and to then pour a bunch of resources into it. I just don't think that there's anything in this complaint to show that it's going to that motivation. I think you're missing the point. We're accepting your proposition that they had hoped it would indeed turn into a good product. Doesn't that then make it more plausible that they would have lied about its current defectiveness because they knew or hoped it would work out fine and then nobody would ever know and hunky-dory? I see what you're saying. Certainly, if there were allegations to that extent in this complaint, I would concede that would be a harder case, but there are no allegations in this complaint concerning it. I think what they're doing is I think they're taking the inaccurate statement on day one and they're parrying the hope argument that you make with an argument, which you can do. You don't have to plead an argument, and their argument is that that fact actually cuts the other way than the way you're tendering it. Although, I think they've conceded it doesn't necessarily help them when it comes to the revenue projections. I just want to go back to, because I'm not following something in the argument, which is if you're contesting that the allegations in the complaint suffice to show that the product wasn't working to some standard that is acceptable within the industry for launching a product, then why are you saying the statement's misleading? Why are you conceding that? I'm not conceding that. Well, I thought for the purpose of the appeal, you're not contesting. Am I wrong? Oh, yes. No, that's incorrect. I am not conceding that the statement was misleading at all. So your view is that that statement that it is a super strong product is not even misleading? I don't believe that this complaint has sufficiently pled that it's misleading. I also don't think that that statement is actionable for the reasons set forth in my papers. I believe that it is a statement of opinion with a dollop of some puffery, but it's also in the context of a statement that Mr. Folger made where he started out by saying, we've got this new product, and we've not been very strong in this area in the past. Five minutes remaining. Five minutes. We've just been okay. We've overhauled the product, and we think this one's super strong. There's no suggestion that the product improved after he said it was super strong. Well, I think there's no suggestion that it worsened, is there? There's no suggestion that it worsened. Quite the opposite. There were patches and hundreds of bug fixes through this. And yet they still pulled it off the market as a complete failure. So doesn't that suggest that on day one, it was hardly super strong? Well, that, Your Honor, respectfully, is a case of fraud by hindsight. It's to look at the results at the end of the day and the decision that was made that no more resources should be put into this product. And to say they must have known it was a complete failure from the start. Well, no, we're not talking about Sienta here. We're going to Judge Barron's question about whether it was, in fact, misleading to describe it as super strong. So we have super strong. So we need to know what it was to ask if the super strong was misleading. And we have an allegation that it wasn't doing what it was supposed to do. And we know that even though it never got worse, they pulled it off the market as a failure. Those facts, not on the issue of Sienta, but on the issue of whether it was misleading, seem to be relevant, don't they? I agree with you. Those are the types of facts that one needs to look at in totality. And then it seems to me that if it's then misleading, then all one needs to know is would the CEO, when he made the statements he did, have known the problems with the product that the complaint alleges were there that provide the foundation for finding the statement to have been misleading? That's correct. So why would we think the CEO wouldn't have known at least what is alleged in the complaint once we say that that's enough to show the statement was misleading? Well, this court has held time and time again that their allegations of must have known are not sufficient. No, I understand that. I'm just saying in context here, given the nature of the statements he was making, the nature of the product, I'm not saying that the CEO had to know everything about the would it ultimately work up to some standard. I'm just saying, would the CEO at least have known the problems that the complaint identifies? What would be the reason to think he wouldn't have? I see. Yeah, I don't think so. And so these are facts in the complaint that I would submit that you consider. One were the ones that I mentioned before. This is one of dozens of products of the company. It wasn't it wasn't going to be a major revenue driver for the company. And in fact, when they also are those facts in the complaint that it wasn't a major revenue driver in the complaint. Yes, because when when the when the product was removed from the market, and this is in the second, the second quarter earnings that's alleged in the complaint, the company said that it was downgraded. The company said that, but that doesn't make it a fact. Well, yes, the company is trying to put the best face on the fact that the product has has fallen flat. Well, the complaint doesn't dispute that the complaint recites it as a fact. Isn't that in some tension with one of the present statements about how important the product was to the right? Yeah. Well, again. A company doesn't release unimportant products. And Mr. Folger, the CFO, did state in in response to an investor question one time that it was a really important product. And he stated one time that it was super strong in the context of saying that we hadn't traditionally been very good in this area before. And it was early days in the in in the launch period. It was within a month of of launch. Counsel, could I ask you something that we haven't raised yet? To create the strong influence of Sienta, the plaintiffs argue, among other things, that we should take into account the resignation of the CEO and the timing of the stock sales by Folger, the CFO. And the district court refused to draw those inferences, citing facts that were not in the complaint to explain both of those things. And you've done the same thing in your brief. Is there any authority on a motion to dismiss to say you can go outside the complaint on that matter? Yes, Your Honor. There is authority to suggest that you can look at documents that are cited or integral to the complaint. Yes, that's right. You can look at documents. But how are any documents cited in the complaint that we'll look at? These are just facts that that were defensive facts that are pulled up by the CFO and by the company, really. Well, district courts and... I mean, can you give me any authority for saying that the usual Rule 12b-6 principles don't apply in these two instances? No, they do. They do apply. They do apply. So I would not... I wouldn't characterize it in that way. But courts across the country, and including courts, circuit courts, including Level 3 Communications, 10th Circuit case, and others, they do look at whether trades were made according to a 10b-5-1 plan. These are all matters of public record. These are filed Form 4s and Form 144s, and they have no good face basis to suggest that they weren't trades that were executed according to... But saying I sold stock not pursuant to a plan, but I sold stock in order to pay some taxes that I had due, that's not something that's going to be shown by any plan document. Yes, that is in a footnote to the Form 4s that are publicly filed. How do you respond to... I believe they make an argument that, yes, that one of the plans came into existence just six weeks before the first misstatement, and that the other one actually wasn't entered into until during the class period. Are those accurate statements? So, Mr. Ali entered into 10 class period stock sales, all according to a 10b-5-1 plan that was entered into in early September of 2018. That is correct, and there is no suggestion that he entered into that plan on that date in September, which is prior to the class period, as part of any fraud. Mr. Folger entered into 16 stock sales during the class period, 13 of which were sales to cover... They were automatic sales to cover tax obligations on investing stock. The other three, one was pursuant to a 10b-5-1 plan that was adopted a couple of months prior to the class period, again, not alleged to have been entered into fraudulently, and then there were two remaining sales, both relatively small, that were pursuant to a plan that was entered into in May, the first week of May in 2019, and there are no particular facts about that. And I would add, Mr. Folger actually ended the class period with a lot more shares of carbonite stock than he started out with, and Mr. Ali, he owned about the same. Thank you. Thank you. Does anyone have any further questions? All set. I think we're all set. Thank you. Thank you, Attorney Nanda. Please mute your audio and video. And Attorney Love, please unmute your audio and video. And Judge, I believe he had asked for three minutes rebuttal, but then asked for the balance of his time, which was about another three minutes. We'll set it for five minutes. Thank you, Judge. Thank you, Your Honors. Andrew Love for appellate. So this was an important product. Defendants talked about that it was an important product that made them extremely competitive in the virtual backup market. It was at paragraph 35 of the complaint. This was a key part of carbonite's flagship data console. Analysts remarked before the launch how important this was at paragraph 43, and when defendants withdrew it from the market, they admitted that they expected it to meaningfully contribute to revenue. So this was an important product that defendants themselves were well aware it was important. On the stock sales, isn't what Ms. Nanda just explained essentially undisputed? As far as they were pursuant to sales, the dates of the sales, and with respect to the September entry of the plan, there's no allegation in the complaint that the CEO in September knew anything at all about the product. Until your last statement, Your Honor, I would agree. September, which is just six weeks before the launch of the product, there are allegations  and so there's an inference that in fact he did know when he made his plan that DME wasn't working, but I think the stronger stock sale issues have to do with CEO Folger. There were two sales made in the month before withdrawal of the product when he had indicated himself, at least with the second one on June 3rd, that he was aware that there were problems and sold stock. So weren't those sales pursuant to a pre-existing plan? Yes, those were. How can we draw an inference of nefariousness from the fact that a prior plan they went through without him having to do anything, and I presume he couldn't stop it? Well, Mr. Folger's plan was put in place after the start of the class period, and this court has held in Ray Ariat that that's different, that if the plan comes in after the class period, then that does not undermine any inference of scienter. And so the stock sales here, standing alone would not support a strong inference of scienter, but they certainly are part of the holistic mix, as is the resignation of Mr. Ali on the very same day that this product was withdrawn and revenue guidance was reduced. And although the district court sort of speculated that he went to a bigger company, and so actually he was getting a promotion, that's certainly a fact question. And analysts at the time commented, and this is at paragraph 71 of the complaint, that suggested that he left because the board was unhappy with his performance and linked his resignation to the problems that were stated that day. Finally, opposing counsel talks about that some of the statements may have been opinions. There was use in terms of whether it was a strong product or not. These statements were made in present tense with certainty, and even assuming they were making statements about a super strong product when they were aware that it did not work. No further questions, I would submit. Thank you. Thank you, Your Honors. That concludes arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court. Counsel, you may disconnect from the hearing.